# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS  DIVISION

| | |
|---|---|
| HENRY C. MERRIDITH, JR. | CIVIL ACTION NO. 04-1227 |
| VERSUS | JUDGE MELANÇON |
| BURL CAIN, WARDEN | MAGISTRATE JUDGE METHVIN |

## REPORT AND RECOMMENDATION

Before the court is a petition for writ of *habeas corpus* filed by *pro se* petitioner Henry C. Merridith[1] on June 4, 2004 pursuant to 28 U.S.C. §2254.[2]  For the following reasons, **IT IS RECOMMENDED** that the petition be **DENIED AND DISMISSED WITH PREJUDICE.**

### Factual and Procedural Background

On March 9, 1999, Merridith was convicted of one count of second degree murder of his aunt, Shirley Ricard, following a jury trial in the Twenty-Seventh Judicial District Court. Sentencing delays were waived, and the statutorily-mandated sentence of life without benefit of parole was imposed.[3]  Merridith is currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.

Merridith timely appealed his conviction to the Third Circuit Court of Appeals raising a claim of insufficiency of the evidence.  Merridith's conviction and sentence were affirmed in an

---

[1] Petitioner's pleadings and the published jurisprudence reveal alternative spellings for petitioner's surname.  When he filed his pleadings, petitioner used the spelling, "Meredith" and that spelling was used by the Third Circuit Court of Appeals and the Louisiana Supreme Court.  See, e.g., State of Louisiana v. Henry Clay Meredith, Jr., 99-00625 (La.App.3d Cir .12/8/99), 759 So.2d 346] and State of Louisiana ex rel. Henry Clay Meredith, Jr. v. State of Louisiana, 2003-1305 (La.4/23/2004), 870 So.2d 287.  However, on May 15, 2006 petitioner advised that his preferred spelling is "Merridith.  See Rec. Doc. 11.

[2] Rec. Doc. 1.  For a complete procedural history of this case, including citations to all documents contained in the state court record, see Memorandum Order dated April 21, 2005, Rec. Doc. 5.

[3] See Rec. Doc. 1, pg. 27.

2

unpublished opinion on December 8, 1999.  See <u>State of Louisiana v. Henry Clay Meredith, Jr.,</u> 99-00625 (La. App. 3d Cir. 12/8/99), 759 So. 2d 346).[4]  Merridith did not seek writs with the Louisiana Supreme Court.

Merridith claims to have filed a *pro se* application for post-conviction relief with the Twenty-Seventh Judicial District Court on October 26, 2000.  When no ruling was rendered, on December 5, 2001, Merridith filed an application for writ of mandamus in the Third Circuit Court of Appeals,[5] which found that the St. Landry Parish Clerk's Office had never received Merridith's application.  Therefore, the Third Circuit granted Merridith's mandamus application "for the sole purpose of transferring the 'Post Conviction Relief Application' to the trial court for filing, consideration, and ruling thereon."  The application raised five claims for relief, including insufficiency of evidence, ineffective assistance of counsel, involuntary confession, confession based on an unlawful arrest, and denial of equal protection and due process based on the grand jury foreman selection process.

On April 5, 2002, Merridith's application for post-conviction relief was denied on the merits.[6]  On April 8, 2003, the Third Circuit denied relief.[7]  On April 23, 2004, the Supreme Court denied writs.  See <u>State of Louisiana ex rel. Henry Clay Meredith, Jr. v. State of Louisiana</u>, 2003-1305 (LA. 4/23/2004), 870 So. 2d 287.[8]

---

[4] Rec. Doc. 44-52.

[5] Rec. Doc. 86-95.

[6] Rec. Doc. 73.

[7] Rec. Doc. 80.

[8] Rec. Doc. 83.

3

In the instant habeas petition, Merredith raises the same claims as those presented to the state courts: (1) insufficiency of evidence; (2) ineffective assistance of counsel;[9] (3) improper admission of his confession because the State failed to prove that his statements were freely and voluntarily given; (4) improper admission of the confession because it was the fruit of an unlawful arrest; and (5) denial of equal protection and due process in the selection of the foreman of the grand jury and ineffective assistance of counsel based upon counsel's failure to file a timely motion to quash.

On June 29, 2006, the undersigned issued a report recommending that Claim 5, which alleges denial of equal protection and due process in the selection of the grand jury foreman be denied and dismissed with prejudice as procedurally defaulted, and that Merridith's claim of ineffective assistance of counsel based upon counsel's failure to file a timely motion to quash the indictment, also part of Claim 5, be denied and dismissed on grounds that Merredith is not entitled to relief on this claim on the face of the petition.[10]  On July 21, 2006, the district judge adopted the reasoning of the undersigned and issued a judgment denying and dismissing those claims with prejudice.[11]  The remaining claims, which were deemed by the undersigned to be ready for a merits review, were served on defendant, which filed its answer on September 15, 2006.[12]

---

[9] Petitioner argues five specific examples of ineffective assistance which are designated as sub-parts A – E of the habeas petition; he argues that his attorney failed (A) to develop facts regarding his intoxication defense; (B) failed to subpoena expert witnesses; (C) failed to investigate; (D) failed to develop possible sources of evidence. Rec. Doc. 1, pp. 33-34.

[10] Rec. Doc. 14.

[11] Rec. Doc. 20.

[12] Rec. Doc. 23.

4

*Standard of Review*

This *habeas* petition was filed on June 4, 2004, and therefore the standard of review is set forth in 28 U.S.C. § 2254(d), as amended in 1996 by The Antiterrorism and Effective Death Penalty Act (AEDPA).  Title 28 U.S.C. § 2254(d) as amended, states:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> **(1)**  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> **(2)**  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the deference scheme laid out in 28 U.S.C. § 2254(d), a federal habeas court must review pure questions of law and mixed questions of law and fact under § 2254(d)(1), and review questions of fact under §2254(d)(2), provided that the state court adjudicated the claim on the merits.  See, e.g., DiLosa v. Cain 279 F.3d 259, 262 (5th Cir. 2002); Martin v. Cain, 246 F.3d 471, 475 (5th Cir. 2001); Trevino v. Johnson, 168 F.3d 173, 181 (5th Cir.), *cert. denied*, 527 U.S. 1056, 120 S.Ct. 22, 144 L.Ed.2d 825 (1999).  This court must therefore defer to the state court on questions of law and mixed questions of fact and law unless its decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  A decision is contrary to clearly established Federal law "if the state court (1) arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or (2) decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 364-65, 120 S.Ct.

5

1495, 1498 (2000).  Under § 2254(d)(1)'s "unreasonable application" language, a writ may issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 365.

A presumption of correctness must be accorded to the state court's factual findings under 28 U.S.C. §2254(e)(1), and this court must defer to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 18 U.S.C. §2254(d)(2).

### *Law and Analysis*

### I.     Claim One: Insufficiency of Evidence

Merredith contends that there was insufficient evidence to establish specific intent in this case.  Specifically, Merridith argues that his marijuana and cocaine intoxication so impaired him that he could not form the necessary specific intent to kill or inflict great bodily harm.

A criminal defendant has a federal due process right to be convicted only upon evidence that is sufficient to prove beyond a reasonable doubt the existence of every element of the offense.  Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). When a defendant seeking federal *habeas* relief contends that the evidence is insufficient to support a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Gibson v. Collins, 947 F.2d 780, 781 (5th Cir. 1991), quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.  The court applies this standard with explicit reference to the substantive elements of the criminal offense as defined by state law, Jackson, 443 U.S. at 323 n.16, 99 S.Ct. at 2792 n.16, and the court "gives great weight

6

to the state court's determination."  Gibson, 947 F.2d at 782, 786; Porretto v. Stalder, 834 F.2d

461, 467 (5th Cir. 1987) (Louisiana Supreme Court's review of evidence for sufficiency to prove

guilt "entitled to great weight in a federal habeas review").  Either direct or circumstantial

evidence can contribute to the sufficiency of the evidence underlying the conviction.  Schrader v.

Whitley, 904 F.2d 282, 287 (5th Cir. 1990), citing Jackson, 443 U.S. at 319, 324-25, 99 S.Ct. at

2789, 2792; Pate v. Wainwright, 607 F.2d 669, 670 (5th Cir. 1979) (*per curiam*).

Merridith was convicted of second degree murder, which is defined as "the killing of a

human being when the offender has the specific intent to kill or inflict great bodily harm."

La.R.S. 14:30.1(A)(1).  "Specific criminal intent is that state of mind which exists when the

circumstances indicate that the offender actively desired the prescribed criminal consequences to

follow his act or failure to act."  La.R.S. 14:10(1).  Specific criminal intent may be inferred from

the circumstances present in the case and the actions of the defendant."  State v. Jack, 596 So.2d

323, 326 (La. App. 3d Cir.), *writ denied*, 600 So.2d 611 (La. 1992).  In establishing that element,

the state may rely on the legal presumption that a defendant "intended the natural and probable

consequences of his act."  La.R.S. 15:432.

A defendant's intoxication or drugged condition at the time of a commission of a crime is

immaterial except "[w]here the circumstances indicate that an intoxicated or drugged condition

has precluded the presence of a specific criminal intent or of special knowledge required in a

particular crime."  La. Rev. Stat. 14:15(2).  Under such circumstances, the fact of intoxication

constitutes a defense to a prosecution for that crime.  The intoxicated or drugged condition is in

the nature of an affirmative defense such that the defendant has the burden of proving the

existence of the condition at the time of the offense.  State v. Lemming, 612 So. 308 (La. App. 5th

7

Cir. 992), *writ denied*, 616 So. 2d 681 (La. 1993).  Additionally, a defendant's activities after the commission of the offense may be considered in determining whether they are consistent with a finding of a specific intent to kill.  State v. Huls, 95-0541 (La. App. 1 Cir. 5/29/96); 676 So. 2d 160, *writ denied*, 96-1734 (La. 1/6/97); 685 So. 2d 126.

The Third Circuit addressed this claim on appeal.  In its opinion affirming Merridith's conviction and sentence, the Third Circuit summarized the evidence, which showed that Merredith gave several inconsistent statement regarding the incidents surrounding his aunt's death before finally confessing to her murder.  Merridith's first statements to police were made on April 4, 1998 at 5:30 a.m., when Merridith approached Patrolman Richard David of the Washington Parish Police Department in his patrol unit across the street from the police station and told him that someone had assaulted his aunt in her home.  (Tr. 504-05).  At that time, Officer David noticed that Merridith had blood on his shirt and shoes.  (Tr. 505).  Merridith next spoke with Patrolman Kevin L. Dupre of the St. Landry Parish Sheriff's Office outside of Ms. Ricard's house, sometime after Dupre started his shift on April 4 at 6:00 a.m.  Patrolman Dupre testified that Merridith told him outside his aunt's house that he had left his aunt's home at 10:00 p.m. the night before and next saw her at approximately 5:00 a.m., when he entered her home and saw that she had been assaulted.  (Tr. 520).  Merridith gave another statement to Patrolman Dupre at the Washington Police Station after being read his Miranda rights.  The time of this statement is not noted in the record, but according to Dupre, in this version, Merridith stated that someone had entered his aunt's home and physically attacked her, and that his own clothing had become stained with her blood when he attempted to help her.  (Tr. 541-42).

8

Merredith gave a fourth statement at the St. Landry Parish Sheriff's Office to Detective Jude Victorian at 12:00 p.m. on April 4. At that time, after having his Miranda rights read again, Merridith told police that at 4:00 a.m. on April 4, he was offered a ride to his aunt's house by an unidentified man who asked to use the bathroom. Merredith stated that as the man left the bathroom, he asked for money, produced a stick, and began to hit Ms. Ricard. The man then made Merridith bring a mattress into the living room, upon which he placed Ms. Ricard before beginning to hit her again. Merridith told police that the man then left the Ricard home with the weapon, at which time Merredith went for help. (Tr. 444-46, 530-32).

After giving this statement, Merridith gave yet another statement to Detective Craig Ortego at 2:04 p.m., in which he admitted that he beat his aunt with a baseball bat after they argued about his coming home late. Merredith stated that he became upset while arguing with Ms. Ricard, grabbed a bat, and struck her several times before he dragged a mattress into the living room and placed her on it. Merridith stated that he then changed out of his bloody clothes and hid the bat and clothing in some tall grass behind the house. At one point in his questioning, Merridith drew a map of where officers could find the bat and clothing that he'd hidden behind his aunt's house. The bat and clothing were later located where Merridith said they were located. (Tr. 448-50, 559-63).

At trial, Merridith took the stand and testified that between 10 p.m. on April 3 and 5:00 a.m. on April 4, he smoked six rocks of crack cocaine and two joints of marijuana. Merridith testified that he arrived at his aunt's house at 4:00 a.m., where they argued about his arriving home late. Merridith testified that during the argument, he "just snapped" and started beating his aunt. (Tr. 652-69).

9

The Third Circuit noted that all of the police officers who came in contact with the defendant on April 4 testified that he exhibited signs of understanding his surroundings and was able to communicate with the officers and walk without difficulty.  The officers testified that Merridith was able to understand questions and clearly responded to all inquiries despite a speech deficit in the form of stuttering, particularly in the morning when he would still have been impaired from his night of doing drugs.  The Third Circuit noted that despite his statements that he was so drugged that he could not have had the specific intent to kill, he was not so drugged that he did not have the presence of mind to hide the blood-stained bat and his bloody clothes behind his aunt's house:

> The defendant's evidence concerning the extent of his drugged or intoxicated condition consisted only of his self-serving testimony of his drug-use activity beginning the night before the commission of the crime.  This testimony was not supported by his own actions.  While asserting on the one hand that he was so intoxicated or drugged that he did not have the specific intent to kill or cause great bodily harm to his aunt, he admitted that he had the presence of mind to go to great lengths to cover up his actions.

(Tr. 51).

The undersigned concludes that the Third Circuit's factual finding was not an "unreasonable determination of the facts in light of the evidence," and, therefore, this court must give deference to that ruling.  It should also be noted that Merridith did not allege until his trial that he had smoked six rocks of crack cocaine.  To the extent that the Third Circuit's conclusion is a mixed question of law and fact on the issue of specific intent, it is not contrary to, or an unreasonable application of, federal law.  Merridith had the presence of mind to hide the bloody bat and clothes and concoct several stories to tell police about how his aunt died.  This evidence clearly belies any allegation that Merridith was so intoxicated that he did not have the specific

10

intent to kill his aunt when he repeatedly bludgeoned her with the bat.  For the foregoing reasons, the undersigned concludes that the evidence was more than sufficient for conviction of second degree murder.  Therefore, this claim is without merit.

**2.    Claim Two: Ineffective Assistance of Counsel**

Four of Meredith's ineffective assistance of counsel claims survived initial review: (A) failure to develop facts regarding his intoxication defense; (B) failure to subpoena expert witnesses; (C) failure to investigate; and (D) failure to develop possible sources of evidence. Although Merredith appears to argue four separate claims of ineffective assistance of counsel, the claims are actually all related to one essential contention, i.e., that Merredith's trial attorney failed to investigate and/or develop facts regarding his intoxication defense.

Merridith specifically contends that his trial attorney, Edward Lopez, failed to introduce at trial a January 29, 1999 psychological report prepared by Mark P. Vigen and Steve L. Whatley, who are both clinical, forensic, and organizational psychologists.  The report stated that Merredith began using drugs at the age of twelve or thirteen and was hospitalized once after overdosing on crack cocaine and two times after experiencing symptoms possibly due to withdrawal from drugs.  The authors of the report state that Merredith is a quiet person with a low IQ who did not commit violent acts prior to his drug use.  The psychologists further state their opinion that "if it were not for the influence of drugs, specifically, crack cocaine, this crime would not have occurred."[13]

_____

[13] The report, which is attached to Merridith's habeas petition as Exhibit "E," states that the evaluation that was conducted consisted of three interviews with Merredith, two interviews with his family, and a battery of neuropsychological tests.  Merredith also underwent the Wechsler Adult Intelligence Scale-Revised, the Wechsler Memory Scale-Revised, several tests designed to detect malingering, the Structured Interview of Reported Symptoms, the Georgia Court Competency Test, the Incomplete Sentences test dealing with courtroom situations, and the Wide Range Achievement Test-III.

11

Merredith argues that his trial attorney was ineffective in failing to use the aforementioned report at trial, because it would have helped prove his drugged and/or intoxicated state of mind at the time of the killing and would have proved that he could not have had specific intent to kill.  Merredith also contends that it was critical for the jury to hear about his history of drug use and the fact that he had been hospitalized because of a drug overdose.  Merridith also argues that his attorney should have subpoenaed "expert doctors" from the facility where he was treated for his overdose, as well as family members, employers, and friends to testify about his history of drug use.  Merredith suggests that his trial attorney did not use the report because he was "mad" at the doctors for charging him $5,129 for the report.

Generally, "conscious and informed decision[s] on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness."  Green v. Johnson, 116 F.3d 1115, 1122 (5th Cir.1997) (quotations and citation omitted).  See also Boyle v. Johnson, 93 F.3d 180 (5th Cir.1996) (noting the heavy deference owed trial counsel when deciding as a strategical matter to forego admitting evidence of a "double-edged nature" that might harm the defendant's case), cert. denied, 519 U.S. 1120, 117 S.Ct. 968, 136 L.Ed.2d 853 (1997).

In the instant case, review of the report itself yields clues as to why trial counsel may have decided not to use the report at trial.  For instance, although the report confirms that Merredith has a history of drug use, it also states that Merredith malingered on several of the neuropsychological tests, and that the results of these tests are, therefore, not reliable.  Clearly, introduction of a report in which the examiners state that the subject is intentionally exaggerating

12

symptoms or otherwise misrepresenting a physical or mental condition would have been a risky trial tactic which could have led to serious doubts about Merridith's credibility.

Furthermore, the extent of the usefulness of Merredith's history of drug use is questionable.  A history of drug use, *per se*, does not absolve an individual from culpability for a crime, and, therefore, it is unlikely that the testimony of family doctors and/or family members that Merridith has a history of drug usage would have changed the outcome of his trial.  Finally, the record shows that trial counsel questioned Merridith at length about his history of drug use and his hospitalizations for drug-related problems.  (Tr. 687-91).  Thus, this information was before the jury.

For the foregoing reasons, the undersigned concludes that trial counsel was not ineffective for failing to use the January 29, 1999 report at trial and for failing to call family doctors and/or family members as witnesses at trial.  Consequently, Merridith's ineffective assistance of counsel claims are without merit.

**3.      Claim Three: Improper Admission of Confession That Was Not Freely and Voluntarily Given**

Merredith contends that his confession to the crime was not voluntarily made, given that he was under the influence of drugs at the time he made it, and that it was, therefore, improperly admitted into evidence.  Merridith also contends that his trial counsel was ineffective for failing to file a motion to suppress the confession on grounds that it was not voluntarily given.

The admissibility of a defendant's confession is a mixed question of law and fact and, as such, merits independent consideration by a federal court in a habeas proceeding." Berg v. Maschner, 2000 WL 34032814, *3 (N.D.Iowa 2000), citing Hill v. Lockhart, 927 F.2d 340, 346

13

(8th Cir.1991), citing *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985).

Except for Merridith's own testimony at the trial, there is no evidence in the record that Merridith was, indeed, under the influence of drugs at the time that he killed his aunt.  No scientific evidence was introduced, nor were any witnesses called, to support Merridith's claims that he was high on drugs at the time of the murder and at the time of his confession. Furthermore, as noted above, the police officers who interviewed Merredith testified that Merredith's speech was coherent, he was able to understand their questions, and he did not stumble, fall, or smell of alcohol.  The officers testified that Merredith was able to write and sign his own statement, he was not visibly shaken, and he appeared to understand his rights. Detective Ortego even testified that Merridith drew a map of where the bloody bat and clothing would be located in the grass behind Ms. Ricard's house, and the items were indeed located there.  (Tr. 559).

The record also shows that Merredith did not give his ultimate confession, in which he admitted that he beat his aunt with the baseball bat, until 2:04 p.m. in the afternoon on April 4 – almost 9 hours after 5:00 a.m., which is the time that Merridith alleged at trial that he *stopped* using drugs on the date of the incident.  (Tr. 652-69).  All of this evidence is inconsistent with Merridith's claims that he was so high on drugs at the time he confessed that his confession cannot be considered voluntary.

Furthermore, even if it were established that Merridith was impaired by drugs at the time he gave his confession, the Supreme Court has made clear that in the absence of coercive police conduct, a criminal defendant's mental state alone cannot make his confession involuntary.

14

Andersen v. Thieret, 903 F.2d 526, 530 (7ᵗʰ Cir. 1990), citing Colorado v. Connelly, 479 U.S. 157, 163-67, 107 S.Ct. 515, 520-22, 93 L.Ed.2d 473 (1986).  Therefore, Merredith's intoxication by itself could not support a finding of involuntariness and is relevant only to the extent it made him more susceptible to mentally coercive police tactics.

Merridith does not contend that the police employed coercive tactics to obtain his confession.  Rather, he argues that he was coming down off of his drug high and that he wanted more drugs at the time that he confessed.  Although he alleges that he initially asked for a court-appointed attorney, he was told that he could not get one on a weekend.  Merridith alleges that Officer Ortego promised him that if he told him the truth about what happened to his aunt, he would make sure that the District Attorney did not charge him with first degree murder.  Merridith admits that, at that point, he decided to confess.  Thus, according to Merridith's allegations, the police did not use coercion tactics to obtain his confession.  Considering the foregoing, and considering that the overwhelming testimony in this case shows that Merridith made a voluntary confession, it is clear that Merredith's confession was properly admitted into evidence.

Because Merridith fails to establish that his confession was not involuntary, he fails to establish that a motion to suppress his confession would have been successful.  Thus, counsel's failure to file a motion to suppress was not deficient performance, and this claim is without merit.  See, e.g., United States v. Gibson, 55 F.3d 173, 179 (5ᵗʰ Cir. 1995) (petitioner's contention that trial counsel's failure to file a motion to suppress evidence based on a faulty search warrant constituted ineffective assistance of counsel was without merit, as counsel is not required by the Sixth Amendment to file meritless motions).

15

**4.      Claim Four: Improper Admission of Confession As Fruit of Unlawful Arrest**

Merredith contends that there was no probable cause for his arrest, and that, therefore, his confession was improperly admitted into evidence because it was the fruit of an illegal arrest.

Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.  Harper v. Harris County, Texas, 21 F.3d 597, 601 (5th Cir. 1994).  Although probable cause requires more than a bare suspicion of wrongdoing, it requires "substantially less evidence than that sufficient to support a conviction."  United States v. Muniz-Melchor, 894 F.2d 1430, 1438 (5th Cir. 1990). As the Louisiana Supreme Court stated in State v. Billiot, 370 So.2d 539, 543 (La. 1979):

> Probable cause exists when the facts and circumstances known to the arresting officer, and of which he has reasonably trustworthy information, are sufficient to justify a person of ordinary caution in believing that the person to be arrested has committed a crime. State v. Davis, 357 So.2d 519 (La.1978); State v. Dunbar, 356 So.2d 956 (La.1978); State v. Johnson, 249 La. 950, 192 So.2d 135 (1966). To determine the existence of probable cause, the court must examine the " 'facts and circumstances within the arresting officer's knowledge, and of which he has reasonably trustworthy information;' " State v. Linkletter, 345 So.2d 452 (La.1977); and do so in light of the experience of reasonable people, not legal technicians. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Probable cause is not absolute cause. Actions of lawmen, therefore, may be supported by less evidence than would justify a conviction. The strength of the requisite probable cause varies with the magnitude of the intrusion and the alternatives available to the peace officer. In the first instance the determination of probable cause is a matter for the trial judge depending, as it often does, upon factual determinations and the credibility of witnesses.

The presence of probable cause is a mixed question of law and fact.  Muniz-Melchor, 894 F.2d at 1439, n.9.  It therefore merits independent consideration by a federal court in a habeas proceeding.  Berg v. Maschner, 2000 WL 34032814, *3 (N.D.Iowa 2000), citing Hill v.

16

Lockhart, 927 F.2d 340, 346 (8th Cir.1991), citing Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985).

At trial, Officer Charles Stelly testified that the decision to take Merridith from the scene of the murder to the Washington police station police station was made by the Washington Chief of Police after Merridith stated that his aunt's home had been broken into and she had been beaten.  Officers investigating the scene noted that there were no signs of forced entry into the home.  (Tr. 540).  Officers also noted that Merridith's clothes and shoes were blood-spattered. At the station, Merridith was read his rights, he signed a form acknowledging same, and he was questioned about what happened.  Officer Stelly testified that, at that time, Merridith was considered a suspect.  (Tr. 541).  Merridith was photographed, given clean clothing, and placed in a jail cell to await his transfer to the St. Landry Parish Sheriff's Office, which handles felony crimes involving fatalities in St. Landry Parish.  (Tr. 545-46).  The record further shows that, while being interviewed by Detective Craig Ortego with the St. Landry Parish Sheriff's Office, Merridith wrote out his own confession, in which he admitted to being the individual who beat his aunt with a baseball bat.  (Tr. 557-58).

It is unclear from the trial testimony when, exactly, Merridith was arrested.  However, it is clear from the record that he was considered a suspect almost immediately upon arrival at the Washington Police Station, and that he was detained from that point forward.  After review of the record, the undersigned concludes that, at the moment that Merridith told the police that his aunt's home had been broken into and he was observed to have blood on his clothing and shoes, it was reasonable for the officers to conclude that Merridith was a suspect in their investigation of the murder of Ms. Ricard.  Therefore, the undersigned concludes that the detention and/or subsequent

arrest of Merridith during that time period was lawful.  As such, the undersigned concludes that Merridith's confession, which has already determined to have been voluntarily made, was properly admitted into evidence, and this claim is without merit.

*Conclusion*

For the foregoing reasons, the undersigned recommends that Marcantel's petition for writ of *habeas corpus* be **DENIED AND DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on May 10, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)